IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONEGAL MUTUAL INSURANCE : | | |
| COMPANY a/s/o VANESSA SCHANTZ, : | 1:08-cv-2171 | |
|     Plaintiff, : | | |
| v. : | (Chief Judge Kane) | |
| : | | |
| ELECTROLUX NORTH AMERICA, : | | |
|     Defendant : | | |

## MEMORANDUM

Pending before the Court is Defendant Electrolux North America's motion for partial summary judgment as to Plaintiff Donegal Mutual Insurance Company's strict liability claim. (Doc. No. 57.) For the following reasons, the motion will be denied.

**I.  Discussion**

Plaintiff Donegal Mutual Insurance Company ("Donegal") has instituted this subrogation action against Defendant Electrolux North America ("Electrolux") for a fire that occurred in November 2006, involving a dryer manufactured by Electrolux. Donegal alleges that the electric clothes dryer was defective and caused a fire in the home of Donegal's insured, Vanessa Schantz. The dryer at issue, Model MDE116REW0, was manufactured in April 1996 by Electrolux and was approximately ten years old at the time of the fire. Schantz testified that she never had any problems with the dryer and she never had to call for service for the dryer. One month prior to the fire, Schantz heard a squeaking noise occasionally coming from the dryer.

Donegal has asserted causes of action sounding in negligence, strict liability, and warranty/breach of contract. Electrolux has moved for summary judgment solely as to Donegal's strict liability claim. On June 23, 2010, the Court held a hearing to allow the parties to present oral argument as to the pending motion.

1

Both parties agree as to the governing law in this case. In Pennsylvania, the court must, in a strict liability claim, "determine, initially and as a matter of law, whether the product in question is 'unreasonably dangerous.'" Riley v. Becton Dickinson Vascular Access, Inc., 913 F. Supp. 879, 881 (E.D. Pa. 1995) (citations omitted); see also Webb v. Zern, 220 A.2d 853, 854 (1966) (adopting Restatement (Second) of Torts § 402A). In making such a determination, the Court engages in "a risk utility analysis, weighing a product's harms against its social utility." Surace v. Caterpillar, Inc., 111 F.3d 1039, 1044 (3d Cir. 1997) (citations omitted). Viewing the evidence in the light most favorable to the plaintiff, the Court determines "whether the evidence is sufficient for purposes of the threshold risk-utility analysis, to conclude as a matter of law that the product was not unreasonably dangerous, not whether the evidence creates a genuine issue of fact for the jury." Id. at 1049 n.10. "If the judge determines as a matter of law 'that the risk-utility balance so favor[s] the manufacturer that the [product] could not be deemed unreasonably dangerous' then the claim does not go to the jury." Kagan v. Harley Davidson, Inc., No. 07-0694, 2008 WL 3874824, at *5 (E.D. Pa. Aug. 20, 2008) (quoting Surace, 111 F.3d at 1048).

The Court's risk utility analysis considers seven different factors to determine whether a product is unreasonably dangerous.[1] These factors include:

> (1) The usefulness and desirability of the product-its utility to the user and to the public as a whole; (2) The safety aspects of the product-the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The

---

[1] As the Third Circuit explained in Surace, the seven factors that have been used by state and federal trial courts are adopted from Dean John Wade's article "On the Nature of Strict Tort Liability for Products," 44 Miss. L.J. 825 (1973), which was cited favorably in the Pennsylvania Supreme Court decision Azzarello v. Black Brothers Company, 391 A.2d 1020, 1026 (Pa. 1978). See Surace, 111 F.3d at 1042-1045.

2

> manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

Surace, 111 F.3d at 1046 (citations omitted).

### A. The usefulness and desirability of the product–its utility to the user and to the public as a whole.

The parties agree that the first factor weighs in favor of Electrolux, as Donegal concedes that the device at issue had a high utility to its users.

### B. The safety aspects of a product–the likelihood that it will cause injury, and the probable seriousness of the injury.

In regard to the second factor, Electrolux point to its own statistical analysis prepared by its experts, which is attached to its motion as Exhibit "C." According to the analysis, "[f]or the U.S., using any model of clothes dryer from any manufacturer, the estimated annual risk of a clothes dryer fire is 1.76 fires per 10,000 dryers." (Ex. C at 6.) For Electrolux dryers, "the estimated annual risk is 0.26 fires reported per 10,000 Electrolux dryers." (Id.) "The annual risk for all clothes dryers is seven times greater than the risk of a reported fire for Electrolux clothes dryers." (Id.) According to Electrolux, this data "demonstrates that Electrolux clothes dryers do not pose an elevated risk of fire compared with other clothes dryers and thus are not an unreasonably dangerous product." (Doc. No. 57 ¶ 49.) In response, Donegal asserts that Electrolux's expert has performed "statistical sophistry," because Electrolux has not produced information specifically pertaining to the dryer model at issue and because a number of claims

may never have been reported to the National Fire Incident Reporting System upon which Electrolux's experts relied. (Doc. No. 73 at 9-10.) Donegal also points out that Electrolux does not address the second part of this factor, "the probable seriousness of the injury if failure occurs," which in the case of house fires is significant. (Id. at 11-12.)

The Court finds Donegal's position persuasive. Electrolux has not produced any information regarding the actual number of dryers that were produced of the specific model at issue. Without such a number, the Court is without the proper information to consider the statistical rate of injury from the design at issue. Furthermore, the second part of this factor weighs in Donegal's favor, as the risk of harm caused by a bearing failure is significantly serious. As Donegal points out in its brief:

> The dryer was designed so that the drum of the dryer is attached to the cabinet with a single bearing/hitch assembly. The electrical heating element for the dryer is attached to the heater housing which is between the rear wall of the cabinet and the back of the drum. As the MDE116REW0 is designed, if the rear bearing fails, the drum shifts and the rear of the drum can contact the energized heating element. When the metal drum contacts the energized heating element, arcing occurs which leads to sparks and molten slag igniting lint or other combustibles within the dryer.

(Doc. No. 73 at 5.) Such a condition can lead to a fire, which "invariably destroys irreplaceable items[,] . . . forces people from their homes . . . [,] [and] causes burn injuries . . . . (Id. at 11-12.) Therefore, the Court will weigh the second factor in Donegal's favor.

### C. The availability of a substitute product which would meet the same need and not be as unsafe.

In regard to the third factor, Donegal asserts that a safer dryer design is possible which would avoid the bearing failure that likely occurred in this case. (Doc. No. 73 at 13-14.) As Donegal's counsel, Michael Hopkins, noted at oral argument, there are changes that could be

4

made to prevent the bearing failure:

> [W]hen [the] bearing fails, the drum of the dryer shifts in the rear, and it's that shifting that allows the metal rear of the drum to contact an electrical coil heating element. It's not insulated because it can't be to perform its function.
>
> So when the rear of that drum hits that energized heating element, you have arcing. You have sufficient energy to melt metal and spew molten metal into either the heater pan, which is right behind the heating element itself, or into the load. . . .
>
> My experts say what you do to eliminate the danger associated with bearing failures in electric dryers is you take that heating element that's behind the drum, you position it on the base of the cabinet, and you run the hot air through ductwork. This is similar to what Electrolux does in some of its gas dryers.
>
> What you do in that case–and you enclose the heating element. So what you've done in that case is, you've removed the possibility of the arcing fire if a bearing fails. You've substantially reduced the possibility of a lint ignition fire because the lint, it's protected because it's covered. Now, my experts don't say it eliminates lint ignition scenarios, but it certainly eliminates the bearing failure scenario.

(Oral Argument, June 23, 2010, at 20-21.) Electrolux asserts that "there is no substitute product that meets the same needs as the clothes dryer and is safer." (Doc. No. 57 ¶ 51.) However, this argument is not persuasive because the "product" at issue is not a dryer in general, but rather the bearing assembly design. The Court is persuaded by Donegal that a substitute design is available that would have prevented the danger of a bearing failure that occurred in this case. Therefore, the Court will weigh the third factor in Donegal's favor.

> **D.** **The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.**

As with the previous factor, Donegal claims that the risk of a drum-bearing assembly

5

failure can be cut significantly by incorporating a design alternative to the drum bearing, and that Electrolux has already incorporated the design change into some of its new dryers. (Doc. No. 73 at 15-16; see also Oral Argument, June 23, 2010, at 21-22.)  Electrolux has failed to rebut Donegal's argument or to show that an alternative design is not reasonably feasible.  Therefore, the fourth factor also weighs in favor of Donegal.

        **E.**        **The user's ability to avoid danger by the exercise of care in the use of the product.**

As to the fifth factor, the parties dispute whether an ordinary user could avoid injury by exercising due care.  "The proper focus in applying the fifth . . . factor then is an objective inquiry into whether the class of ordinary purchasers of the product could avoid injury through the exercise of care in use of the product, not whether this particular plaintiff could have avoided the particular injury."  See Surace, 111 F.3d at 1051.  Electrolux asserts that "[a]n 'ordinary' consumer would have been able to avoid the dangers associated with a bearing failure due to the noise that is generated by the dryer." (Doc. No. 57 ¶ 75.)  According to a video prepared by Electrolux, a noise level of 75-86 decibels may be generated by a bearing failure.  (Id. ¶ 79.) However, as Donegal accurately points out, the noise that Electrolux's expert may have produced on the video is not the occasional squeaking noise that Schantz testified to hearing. (See Doc. No. 57 ¶ 80.)  Donegal asserts that Electrolux "has presented no evidence that this scenario would indicate to an ordinary consumer, or any consumer, that their dryer was about to fail into a potentially fire causing condition."  (Doc. No. 73 at 18.)

The Court is again persuaded by Donegal.  As Mr. Hopkins stated at oral argument, a dryer that sustained a bearing failure would continue to dry clothes in a timely manner.  The only indication that the dryer had become dangerous would be the sound that the dryer emitted.

6

Given the occasional squeaking sound described by Schantz, the Court finds that an ordinary user could not have avoided the danger posed by the bearing failure by exercising due care because the occasional squeaking would not have given an ordinary consumer adequate notice that her dryer had fallen into a dangerous condition. Therefore, this factor also weighs in favor of Donegal.

> **F.** **The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.**

Donegal points out that the Owner's Guide included with the dryer at issue did not include anything warning against the squeaking noise that Schantz testified to hearing or about the risk of a bearing failure. (Doc. No. 73 at 19.) Electrolux argues that its Owner's Guide gives specific instructions on how to prevent a fire and the consequences of not following the instructions. (Doc. No. 57 ¶ 87.) At oral argument, Electrolux's counsel, Melissa Yemma, argued that the sound that Schantz heard was sufficient notice to warn a reasonable user to discontinue using the dryer. (Oral Argument, June 23, 2010, at 12.)

As with the fifth factor, the Court is not persuaded by Electrolux's argument that the noise described by Schantz would have provided sufficient warning to an ordinary consumer of a dangerous condition in the dryer. Furthermore, although the instruction manual that was included with the dryer at issue included multiple warnings, no instructions were given about the danger of a squeaking noise or about a bearing failure. (See id.) As a result, the Court finds that the sixth factor weighs in favor of Donegal.

> **7.** **The feasibility on the part of the manufacturer of spreading the loss of setting the price of the product or carrying liability insurance.**

Both parties argue that the burden of allocating fault should be shifted to the opposing party. The Court finds that the burden of spreading the loss in this case is better placed on the manufacturer than on Schantz, the individual consumer.

### III.    Conclusion

After undertaking the foregoing risk utility analysis, the Court finds that six of the seven factors weigh in Donegal's favor and that the risk of harm from the bearing assembly design outweighs its social utility. Therefore, in viewing the evidence in the light most favorable to Donegal, "the evidence is sufficient, for purposes of the threshold risk-utility analysis, to conclude as a matter of law that the product was . . . unreasonably dangerous . . . ." <u>Surace</u>, 111 F.3d at 1049 n.10. As a result, Electrolux's motion for summary judgment as to the strict liability claim will be denied, and Donegal's strict liability claim will be allowed to go to the jury. An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONEGAL MUTUAL INSURANCE** | : | |
| **COMPANY a/s/o VANESSA SCHANTZ,** | : | 1:08-cv-2171 |

|  |  |
|---|---|
| Plaintiff, | : |
| v. | : (Chief Judge Kane) |
|  | : |
| **ELECTROLUX NORTH AMERICA,** | : |
| **Defendant** | : |

## ORDER

**AND NOW**, on this 10th day of August 2010, upon consideration of Defendant's motion for partial summary judgment, it is **HEREBY ORDERED THAT** the motion is **DENIED**.

s/ Yvette Kane<br>
Yvette Kane, Chief Judge<br>
United States District Court<br>
Middle District of Pennsylvania